[No. 62737-6-I.   Division One.   January 4, 2010.]

JAMES MAIER ET AL., *Appellants*, v. NANCY GISKE, *Respondent*.

*David F. Cooper*; and *Thomas F. Peterson* and *Adam R. Asher* (of *Socius Law Group PLLC*), for appellant.

*David S. Mann* (of *Gendler & Mann LLP*), for respondent.

¶1 LAU, J. — This appeal involves a series of real property disputes between two Vashon Island neighbors. James Maier and Elizabeth Hendrix-Maier filed suit against Nancy Giske, alleging that she constructed a fence and planted shrubbery to block their easement access. Giske disputed the easement's validity and claimed the Maiers injured her plants and caused her bluff to collapse. She also sought to acquire parts of the Maiers' property through adverse possession. Because the trial court concluded the Maiers' purported easement failed to comply with the statute of frauds, it dismissed their claims on summary judgment. And after a bench trial on her counterclaims, it quieted title in Giske to some of the property she sought, awarded her $21,130 for plant damage, and rejected one of her adverse possession claims and her claim for loss of lateral support. Both sides appeal.

¶2 We conclude the trial court erred in granting summary judgment based on the statute of frauds because the written legal description in the Maiers' deed is sufficient to allow the easement to be located without recourse to oral testimony. The court also erred in awarding Giske damages for plants not located on her property. We affirm the trial court in all other respects. Thus, we reverse in part, affirm in part, and remand.

## FACTS

¶3 In the 1940s, Giske's grandparents, Howard and Hilda Giske, acquired several properties off the end of Southwest Maury Park Road on Vashon Island. In 1952, they transferred a portion of their property to Giske's uncle and aunt, who subsequently transferred it to her parents. Giske acquired this parcel from her father and began living there in 1978.

¶4 Giske's grandparents also retained a large piece of land immediately to the east of this parcel until their deaths. In 1976, the executrix of Hilda Giske's estate sold a portion of this property to the Luehrs family. The deed conveyed

[t]hat portion of Government Lot 3, Section 16, Township 22 North, Range 3 East, W.M., described as follows:

Beginning at a point on the East boundary line of said Government Lot 3; North 0°19'24" West 422.51 feet from the Southeast corner thereof; thence North 68°44'27" West 32.26 feet to a point on a line 30 feet West of and parallel to the East boundary line of said Government Lot 3; thence continuing North 68°44'27" West 161.31 feet to a point on a line 180 feet West of and parallel to the East line of said Government Lot 3 and the true point of beginning of the tract herein described; thence North 0°19'24" West parallel to the East line of said Government Lot, to the Government meander line; thence Northwesterly along said meander line to a point on a line 255 feet West of and parallel to the East line of said Government Lot 3; thence South 0°19'24" East along a line parallel to the East line of said Government Lot to a point North 68°44'27"["] West of the true point of beginning; thence South 60°44'27" East to the true point of beginning;

. . . .

TOGETHER WITH a non-exclusive easement over a strip of land 15 feet in width and extending from the Westerly margin of the above described tract to the East line of said Government Lot 3; the Northerly line of said 15 foot strip running North 68°44'27" West from a point on the East line of said Govern-

ment Lot, distant North 0°19'24" West 422.51 feet from the Southeast corner of said Government Lot.

In 1977, the Luehrs sold the property to the Whetstones, and in 1999, the Whetstones conveyed it to the Maiers. Each instrument conveying the property contained the same easement description quoted above.

¶5 Giske's son, Max Batres, ultimately acquired the portion of Hilda Giske's estate lying immediately south of the Maiers' property. The disputed easement runs over the northern 15 feet of this parcel. Batres does not reside on the property, and Giske, whose property is immediately to the west of his, acts as its caretaker for him.

¶6 There is a gravel driveway linking the three parcels to Southwest Maury Park Road. It extends over the northern edge of Batres's property and turns onto the southeastern corner of the Maiers' property, terminating near their residence. There is a concrete parking pad on Batres's property where the drive turns that Giske uses to access her house.

¶7 In approximately 1982, the Whetstones constructed a fence along the southern boundary of their property, extending west from the gravel driveway. However, they built the fence two feet north of the surveyed property line. Giske installed planks and raised a berm along the south side of the fence. She landscaped the area with numerous plants, including a large Pacific wax myrtle tree. Near her front porch and on her side of the fence, but in the southwestern corner of the Whetstones' property, she also planted several *camellia japonica* shrubs. She regularly cultivated the area south and southwest of the Whetstones' fence and maintained exclusive, uninterrupted control of it between 1982 and 2004.

¶8 In 2004, the Maiers began removing the southern boundary fence. They installed a string line two feet south of the former fence along the surveyed boundary line between their property and the Batres property. In the process, they significantly damaged the wax myrtle tree

Giske had planted. The Maiers also removed a large camellia from the area near Giske's front porch.

¶9 Giske contracted to have a new fence installed on her son's property immediately west of where the gravel driveway turned north to the Maiers' property. The Maiers objected that they had an easement across the northern 15 feet of Batres's property based on their deed. They claimed the new fence was interfering with their right to access the easement area, on which they planned to build a vehicle turnaround. As the construction crew was installing the fence, Elizabeth Hendrix-Maiers argued with Giske, and after the crew left, she pushed over one of the fence posts. The Maiers also removed nine arborvitae shrubs Giske had planted along the access way to her house.

¶10 The neighbors' conflicts extended beyond the disputed easement area. Giske alleged that the Maiers cut down her shore pine to its trunks. The shore pine was slightly on her side of the north-south running boundary line between her property and the Maiers' property. The Maiers claimed they only cut branches overhanging their property.

¶11 They also disputed ownership of a small triangular area on the northwestern corner of the Maiers' property. A boundary survey indicated the area belonged to the Maiers. But Giske claimed that she planted a white mountain ash tree and other vegetation in the area and she had acquired the land by adverse possession.

¶12 Along the northern edge of the Maiers and Giske properties are bluffs overlooking Puget Sound. In 2005, the Maiers began excavating the western portion of their bluff to relocate a stairway and boat platform. Shortly after the excavation began, Giske's bluff, which was directly adjacent, began to collapse. She blamed the Maiers for the damage to her property.

¶13 In 2006, the Maiers brought trespass and nuisance claims against Giske, alleging interference with their easement rights. In her answer, Giske asserted as affirmative

defenses that the easement's scope was limited to the existing driveway and that it was extinguished by adverse possession or abandonment. Giske also asserted several counterclaims. She sought to quiet title based on adverse possession to (1) the two-foot strip between the Batres property and the Whetstones' fence, (2) the southwest corner of Maiers' property near her house, and (3) the northwest corner of the Maiers' property where she planted the mountain ash. Additionally, she requested damages for injury to various plants and for the loss of lateral support to her bluff.

¶14 Before trial, Giske moved for summary judgment dismissal of the Maiers' claims. She argued and the trial court found that the easement was void for failure to comply with the statute of frauds because it did not sufficiently describe the servient estate. Accordingly, it dismissed the Maiers' claims.

¶15 After a bench trial on Giske's counterclaims, the court awarded her treble damages for the injured plants under Washington's timber trespass statute. It also found that the Maiers' destruction of the trees and shrubs caused her significant emotional distress and awarded her $7,000 in emotional damages. The court quieted title in Giske to the two-foot strip and the southwest corner of the Maiers' property but rejected her claim to the northwest corner of their property. Additionally, the court found that Giske failed to demonstrate by a preponderance of the evidence that the Maiers' actions caused her bluff to collapse. The Maiers appeal, and Giske cross-appeals.

## ANALYSIS

### Validity of Easement

¶16 The Maiers contend the trial court erred in granting Giske's summary judgment motion because their easement was sufficiently described to satisfy the statute of frauds. We review summary judgment orders de novo, engaging in the same inquiry as the trial court. *Harberd v.*

*City of Kettle Falls*, 120 Wn. App. 498, 507, 84 P.3d 1241 (2004). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 630, 71 P.3d 644 (2003). And whether an agreement violates the statute of frauds is a question of law. *Dickson v. Kates*, 132 Wn. App. 724, 733, 133 P.3d 498 (2006).

¶17 The purpose of the statute of frauds is to prevent fraud arising from inherently uncertain oral agreements. *Howell v. Inland Empire Paper Co.*, 28 Wn. App. 494, 498, 624 P.2d 739 (1981). It requires that "[e]very conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed . . . ." RCW 64.04.010. Deeds must "be in writing, signed by the party bound thereby, and acknowledged . . . ." RCW 64.04.020. Washington courts have long held that to comply with the statute of frauds, a deed conveying land must describe the land conveyed in sufficient detail that it can be located without recourse to oral testimony (unless the deed refers to another instrument that does contain a sufficient description). *Bigelow v. Mood*, 56 Wn.2d 340, 341, 353 P.2d 429 (1960). An agreement containing an inadequate legal description is void. *Howell*, 28 Wn. App. at 495-96. Washington's rule is "the strictest in the nation . . . . In most states an incomplete description or a street address is sufficient, and parol evidence may be received to locate the land. Not so in Washington." 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 16.3, at 225 (2d ed. 2004).

¶18 Here, the deed language at issue grants an easement rather than conveying land. An easement is a nonpossessory right to use another's land in some way without compensation. *Richardson v. Cox*, 108 Wn. App. 881, 884, 26 P.3d 970, 34 P.3d 828 (2001). Because they are interests in land, express easements must comply with the statute of frauds. *Ormiston v. Boast*, 68 Wn.2d 548, 550, 413

P.2d 969 (1966). However, with easements, the description requirement can be relaxed. The statute of frauds does not require a description of an easement's exact location so long as the easement can be located on a specific servient estate. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). Such easements are described as "floating," and a court can consider parol evidence to establish their precise location on the servient estate. *Smith v. King*, 27 Wn. App. 869, 870-71, 620 P.2d 542 (1980).

¶19 But if the easement's exact location *can* be ascertained from the instrument itself, then the description is sufficient to comply with the statute of frauds. *See City of Seattle v. Nazarenus*, 60 Wn.2d 657, 661, 374 P.2d 1014 (1962) (statute of frauds not violated where the precise land covered by an easement could be ascertained from attached blueprint that showed the boundaries of the right of way). Here, the easement's exact location can be ascertained from the description in the Maiers' deed. This instrument gives a metes and bounds description of the northern, eastern, and western lines of the easement area and states that the easement runs over a 15-foot strip. From this description, a surveyor could locate the area covered by the easement without recourse to oral testimony. Because the description in the instrument is sufficient to allow the easement to be located without parol evidence, it does not violate the statute of frauds.

¶20 But Giske argues it is not enough to describe the precise location of an easement. Relying on *Berg v. Ting*, 125 Wn.2d 544, 886 P.2d 564 (1995), she contends that the statute of frauds requires an instrument granting an easement to describe the entire parcel of land burdened by the easement regardless of whether it identifies the easement's specific location.[1] We disagree.

---

[1] Giske also argues the easement fails to comply with the statute of frauds because it was not "recorded on the servient estate." Clerk's Papers at 74. To support this argument, she points to the title insurance policy for the Batres parcel, which failed to disclose the easement. Resp't's Br. at 24. But this

¶21 In *Berg*, property owners brought an action to quiet title to a purported easement over their neighbors' property. The writing at issue described the easement's location as portions of various lots in a short plat application and indicated that the " 'exact location . . . shall be determined by reference to the conditionally granted Application when the same is finally approved.' " *Berg*, 125 Wn.2d at 548. But when the application was finally approved several years later, the subdivision of lots had been rearranged and the purported easement ran over a lot that was not mentioned in the grant of easement. Consequently, it was impossible to determine the easement's exact location from the deed and the approved short plat application to which it referred. The property owners did not dispute this fact. Instead, they argued the writing was sufficient to satisfy the statute of frauds based on a floating easement theory. They noted that appended to the grant of easement was the legal description of a larger tract of land, of which the servient lot was a part. The court rejected this argument, concluding that floating easements must describe the "specific servient estate" they burden. *Berg*, 125 Wn.2d at 551 (emphasis omitted) (quoting *Smith*, 27 Wn. App. at 871). Thus, the grant of easement in *Berg* violated the statute of frauds because it failed to describe *both* the precise location of the easement *and* the larger servient estate.

¶22 But here, there is no contention that the easement is floating. Its location is specifically described, and there is no need to resort to uncertain oral agreements. We conclude that *Berg* does not apply here and that the trial court erred

argument misperceives the relationship between the statute of frauds, the recording system, and title insurance. The statute of frauds simply requires that an interest in real property be conveyed in writing in the form of a deed. It does not require the writing to be recorded. And while a bona fide purchaser who has no notice of an easement burdening the land will take title free of the easement, it is the official recording system—not the information in a title insurance report—that governs whether the purchaser is charged with constructive notice. *See* 18 Stoebuck & Weaver, *supra*, § 14.6, at 132. Here, the purchaser was not Giske but Batres, and he had constructive notice based on the properly recorded 1976 deed that granted the easement.

in granting Giske's summary judgment motion. We reverse and remand.[2]

*Adverse Possession*

¶23 The Maiers also contend Giske failed to establish adverse possession of the two-foot strip of land along part of the southern boundary of their property.[3] Adverse possession is a mixed question of law and fact. The trier of fact determines whether the essential facts exist, and the court determines whether those facts constitute adverse possession. *Anderson v. Hudak*, 80 Wn. App. 398, 401-02, 907 P.2d 305 (1995). On appeal, this court reviews the adverse possession determination de novo, but defers to the factual findings made below. *Bryant v. Palmer Coking Coal Co.*, 86 Wn. App. 204, 210, 936 P.2d 1163 (1997).

¶24 To successfully establish an adverse possession claim, a party must show the possession for the statutory 10-year period was (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile. *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984). The burden of establishing each element is on the party claiming to have adversely possessed the property. *Anderson*, 80 Wn. App. at 401-02. The Maiers do not assign error to the court's finding that Giske maintained exclusive, uninterrupted control of the area between 1982 and 2004. Consequently, it is a verity on appeal. *Lingvall v. Bartmess*, 97 Wn. App. 245, 250, 982 P.2d 690 (1999).

¶25 The Maiers' argument is focused on whether the possession was "open and notorious" and "hostile." The open and notorious element is satisfied where the use of property is such that "any reasonable person would assume" the claimant was the owner. *Chaplin*, 100 Wn.2d at

---

[2] The parties request that we address their arguments regarding the easement's scope and whether it was extinguished by abandonment or adverse possession. We decline to resolve these questions as a matter of law based on the record before us.

[3] On appeal, the Maiers do not challenge the trial court's award of the southwest corner of their property to Giske through adverse possession.

862. The hostility element "requires only that the claimant treat the land as his own as against the world throughout the statutory period." *Chaplin*, 100 Wn.2d at 860-61. The only relevant consideration is the claimant's treatment of the land, not his subjective belief about his true interest in the land. *Riley v. Andres*, 107 Wn. App. 391, 397, 27 P.3d 618 (2001).

¶26 Here, the record supports the trial court's findings related to these issues and the findings support its conclusion that Giske adversely possessed the area. Giske testified that she installed planks and built a berm along the south side of the Whetstones' fence, planted trees and shrubs between the planks, and generally landscaped and maintained the area as her own. In *Anderson*, the court noted that in successful claims of adverse possession, "the parties furnish[ ] some evidence of usage," which "include[s] acts such as clearing land, mowing grass, and maintaining shrubs and plants." *Anderson*, 80 Wn. App. at 404 (emphasis omitted). Here, Giske used the land in ways that would cause a reasonable person to assume she was the owner. Further, her subjective beliefs about her true interest in the land are not relevant. She treated the land as an owner, satisfying the "hostility" element.[4]

¶27 In her cross appeal, Giske contends the trial court erred in ruling that she failed to establish adverse possession of what she refers to as the "mountain ash triangle," a portion of the northwest corner of the Maiers' property near her bluff. The trial court found that while the mountain ash was very special to Giske, its planting and the planting of some nearby vegetation did not satisfy the notoriety and hostility elements required for adverse possession. The court explained, "It is not clear that she had maintained the plants in the area in a way that would be recognized by others . . . ." But Giske argues that there is a visual difference between the area west of the mountain

---

[4] In their reply brief, the Maiers also suggest Giske's adverse possession claim should fail because her use of the area was permissive. But they cite nothing in the record that supports this argument.

ash and the area east of it. She argues that "a reasonable person, upon seeing the property and disputed line[,] would assume that the property west of and including the mountain ash" belonged to her. Resp't's Br. at 43.

¶28 Giske relies on *Lingvall*, but in that case, the adverse possessor did more than plant a tree and some shrubbery. "She and her husband cleared away brush and wild shrubbery. They landscaped, mowed, and maintained the area continuously and exclusively . . . ." *Lingvall*, 97 Wn. App. at 254. Here, when Giske was asked what she had done to take care of the area, she responded, "Well, it's in an area of wild vegetation." Report of Proceedings (RP) (Oct. 13, 2008) at 74. She gave no indication that she did anything other than plant a tree and some other vegetation in the area. Thus, her case is more like *Anderson*, where the court held that a neighbor's mere planting of trees on another's property was insufficient to establish adverse possession. *Anderson*, 80 Wn. App. at 404-05. Moreover, the trial court's findings do not support her contention that there is a clear visual difference between the western and eastern sides of the mountain ash area.[5] Under these circumstances, the court's conclusion that Giske failed to establish adverse possession was not erroneous.

*Plant Damage Award*

¶29 The trial court awarded Giske damages under Washington's timber trespass statute, which provided that a plaintiff could recover treble damages for plant damage under certain circumstances.

Whenever any person shall cut down, girdle or otherwise injure, or carry off any tree, timber or shrub on the land of another person, or on the street or highway in front of any

---

[5] Giske refers to an exhibit showing that the majority of the Maiers' yard is mowed, whereas its western boundary (with Giske's property) is filled with vegetation. But this picture does not demonstrate that a reasonable person would assume the vegetation-filled area belongs to Giske. An equally plausible assumption would be that the area belongs to the Maiers and that they use the vegetation for privacy.

person's house, village, town or city lot, or cultivated grounds, or on the commons or public grounds of any village, town or city, or on the street or highway in front thereof, without lawful authority, in an action by such person, village, town or city against the person committing such trespasses or any of them, if judgment be given for the plaintiff, it shall be given for treble the amount of damages claimed or assessed therefor, as the case may be.

Former RCW 64.12.030 (1881).[6] A plaintiff can also recover for emotional distress resulting from the trespass. *See Birchler v. Castello Land Co.*, 133 Wn.2d 106, 113, 116, 942 P.2d 968 (1997) (emotional distress damages not a cumulative remedy, but "merely another item of damages for a wrong committed as a result of timber trespass"). However, if the trespass was "casual or involuntary" or if the defendant had probable cause to believe the land was his own, recovery is limited to single damages. RCW 64.12.040.

¶30 Here, the trial court awarded $14,130 for injuries to five different types of plants: $4,590 for nine *pyramidal arborvitae*, $2,400 for the Pacific wax myrtle, $900 for the camellia, $5,400 for the shore pine, and $840 for an osmarea. In addition, the court awarded Giske $7,000 for her emotional distress. The Maiers raise several challenges to the court's award.

¶31 First, the Maiers argue the trial court erred in awarding Giske treble damages because they had probable cause to believe the land on which the plants were growing belonged to them. They rely on the mitigation provision in RCW 64.12.040 that limits a plaintiff's recovery to single damages. But this provision is inapplicable when the trespasser is aware of a property dispute before removing or injuring the plants.

Where a person has knowledge of a bona fide boundary dispute, and thereafter consciously, deliberately, and intentionally enters upon the disputed area for the purpose of destroy-

---

[6] In 2009, the legislature amended the timber trespass statute to specifically reference Christmas trees, but those changes are not relevant here.

ing, and does destroy, trees or other property which cannot be replaced, such acts are neither casual nor involuntary, nor can they be justified upon the basis of probable cause for belief by the tort feasor that he owned the land, but, on the contrary, are without lawful authority and will subject such person to treble damages as provided by statute.

*Mullally v. Parks*, 29 Wn.2d 899, 911, 190 P.2d 107 (1948); *see also Happy Bunch, LLC v. Grandview N., LLC*, 142 Wn. App. 81, 96, 173 P.3d 959 (2007) ("A mere subjective belief in the right to cut trees is not sufficient for mitigation pursuant to RCW 64.12.040.").

¶32 Here, the trial court found that the Maiers' actions were intentional and not "casual or involuntary." The court found that they knew the easement area, its scope, and the area claimed by adverse possession were in dispute prior to removing the vegetation and that they "deliberately destroyed" the plants. The court concluded that the Maiers did not have probable cause to believe the plants were on their property and that they were not entitled to mitigation under RCW 64.12.040. The Maiers fail to show this decision was erroneous, so we affirm the trebling of the damages.

¶33 Second, the Maiers assert that there is insufficient evidence that they cut the shore pine on Giske's property. They claim to have merely cut branches overhanging their property. But the trial court found that they "intentionally cut down or caused to be killed the shore pine" and that while "they were entitled to cut back branches that overhang their property, they were not entitled to cut down the entire shore pine." This finding is supported by Giske's testimony at trial. She testified that the Maiers cut branches from her side of the property line and cut down to the trunks. When asked whether the tree was still there, she responded, "Just the stumps." RP (Oct. 13, 2008) at 144. And the trial court expressly stated, "To the extent there is conflict in the testimony regarding the habit of the shore pine, the court resolves those conflicts in favor of Giske because the court questions Jim Maier's credibility and the court finds that the Maiers deliberately

destroyed other of Giske's plants." The trier of fact is entitled to evaluate the credibility of witnesses, and this court will not second-guess its determinations. *Simpson v. Thorslund*, 151 Wn. App. 276, 287, 211 P.3d 469 (2009). There is sufficient evidence in the record to support its findings regarding the shore pine.

¶34 Third, the Maiers contend the court erred by awarding damages to Giske for injuries to plants on property she does not own. They argue that the "person" the timber trespass statute gives a right of action to is the person on whose land the tree or shrub was injured, not a caretaker of that property or a landowner adjacent to it. This contention accords with the plain meaning of the statutory language and the court's prior cases. *See, e.g., Seattle-First Nat'l Bank v. Brommers*, 89 Wn.2d 190, 197, 570 P.2d 1035 (1977) ("The rules in Washington for awarding treble damages under RCW 64.12.030 and .040 are well established. . . . A person who willfully or recklessly cuts down and removes trees from the land of another is liable *to the latter* for treble damages." (emphasis added)). Consequently, Giske's suggestion that she has standing because "the statute requires only that the defendant trespasses onto property they do not own and injures trees or shrubs" is without merit.[7] Resp't's Br. at 28.

¶35 Giske also points to another clause in the timber trespass statute that allows a plaintiff to recover for plants injured "on the street or highway in front of [the plaintiff's] house." RCW 64.12.030. She contends this provision allows her to recover for damage to plants along the access way between the concrete parking pad on her son's property and her house. She relies on a single case— *Simons v. Wilson*, 61 Wash. 574, 112 P. 653 (1911). There, Simons, the owner of several unimproved lots in Spokane, brought an action against Wilson, who cut and removed trees from the street and alley that were abutting the lots.

---

[7] Giske also claims the shrubs at issue belonged to her. But she cites no authority for the proposition that a person owns vegetation on another person's land simply by virtue of planting and tending the vegetation.

*Simons*, 61 Wash. at 574. Wilson argued that Simons had no standing because she was not the owner of the land on which the trees were cut. *Simons*, 61 Wash. at 575. The court rejected this argument. "[I]rrespective of whether the fee to the streets is in the municipality or the abutting lot owners, a right of action is given by this statute to the lot owner, against any person cutting down the trees growing *on the street* adjacent to such lot." *Simons*, 61 Wash. at 575 (emphasis added).

¶36  But here, Giske's interest in Batres's property is not analogous to a property owner's interest in an abutting street. Property owners have fee title to streets and alleys that adjoin their property, subject to certain public rights of use. *See State v. Wineberg*, 74 Wn.2d 372, 377, 444 P.2d 787 (1968). In contrast, Giske does not have fee title to her son's property. Therefore, the injured plants are not in the "street" in front of her house and the trial court erred in awarding her damages for them. Accordingly, we remand for the trial court to recalculate the appropriate damages.[8] And we leave to the trial court the determination of whether and to what extent any corresponding reduction in the emotional distress award is warranted.

### Loss of Lateral Support to Giske's Bluff

¶37 The trial court found that the Maiers began excavating the western portion of their bluff in late 2005. Their goal was to relocate a stairway and boat platform from the central area of their bluff to the western area, near their boundary with Giske's property. Shortly after the excavation began, the bank started to collapse, damaging Giske's property. The court stated,

> Without evidence from an expert, we cannot know whether the bank collapse would have occurred absent the actions of the

---

[8] It is not entirely clear from the record which plants were on the land Giske acquired by adverse possession as opposed to the easement area on Batres's land. It is also uncertain whether Giske's remaining easement arguments will prevail on remand. Regardless of how these issues are resolved on remand, the trial court must limit Giske's damages under the timber trespass statute to plants injured on her own property.

Maiers, or whether the existing cracks were aggravated by the work on the Maier bank, or whether the bluff collapse was the result of the Maiers' actions on their bank.

. . . While the court is sympathetic to Ms. Giske's testimony about what the loss of the bank means to her, the court cannot say that she established by a preponderance of the evidence that the Maiers caused a loss of lateral support to her bluff.[9]

¶38 Giske contends the trial court erred by ruling that expert evidence was required to prove the Maiers' actions caused the damage to her shoreline bluff. But reading the trial court's statements in context, it did not rule that expert opinion was necessary as a matter of law. Rather, the court found that in Giske's case, her evidence was insufficient to prove causation "by a preponderance of the evidence."

¶39 Evidence was adduced at trial suggesting other reasons the bluff may have collapsed. For example, James Maier testified that during the winter of 2005, there were unusually high tides that washed away a large log protecting the bank. He also testified that there were record rains that winter and that another bank in the area also collapsed. Additionally, Giske herself testified that when she spoke with a geologist at the King County Department of Development and Environmental Services, he told her that the Maiers' actions were not responsible for the bank slumping. Given this context, we read the court's reference to the lack of expert testimony supporting Giske's claim as an explanation for why her evidence was insufficient to satisfy the preponderance of the evidence standard, not as

---

[9] Giske quotes the court as finding, "It must be said that the court's instinct tells it that the bluff collapse affecting Ms. Giske's bank probably was initiated by the work the Maiers did on their bank." Resp't's Reply Br. at 7. But the court specifically crossed out this language from the proposed findings of fact Giske's counsel submitted to the court. This action suggests the court was not convinced the Maiers' actions "probably" caused Giske's bluff to collapse.

a statement that expert testimony is required as a matter of law in loss of lateral support cases.

¶40 We reverse in part, affirm in part, and remand.

Dwyer, A.C.J., and Grosse, J., concur.